BROWN, Chief Judge,
dissenting.
|TI respectfully dissent.
Initially, a panel of this court unanimously reversed a trial court’s grant of certain exceptions of no right of action filed by mineral lessees, Chevron, Devon and Merit. Rehearing, however, was granted because of a similar case pending before the Louisiana Supreme Court. That case, Marin v. Exxon Mobil Corp., 09-2368, 48 So.3d 234 (La.10/19/10), has now been decided; however, disappointingly, in Marin, the supreme court did not reach an opinion on the issue that is specifically presented in the case sub judice. In that case, in a footnote, the majority opinion states:
We note that one of the reasons we granted this writ was to determine whether a subsequent purchaser has the right to sue for property damages that occurred before he purchased the property, particularly where the damage was not overt. However, we need not reach that determination in this case because, assuming the Breauxs had a right as a subsequent purchaser to sue in tort for property damage, that right has prescribed. Further, we note that regardless of who has standing to pursue claims for money damages, the mrrent owner of property always has the right to seek a regulatory cleanup of a con- *28 laminated site. La. R.S. 30:6(F); La. R.S. 30:16. (Emphasis theirs).
The circuit courts are split on whether a subsequent purchaser has the right to sue for property damages that occurred before he purchased the property. Although recognizing the need to resolve this question, the supreme court was unable to agree and passed. Thus, the only supreme court decision extant is Magnolia Coal Terminal v. Phillips Oil Co., 576 So.2d 475 (La.1981). In that case, plaintiff purchased contaminated property that was burdened with a mineral lease. The seller reserved all mineral |¡>rights in the act of sale. After the purchase, Magnolia sued the successor and assignee of the mineral lease seeking remediation of the contamination. Even though most of the damage resulted from a blowout on the property 17 years before Magnolia purchased it, the Louisiana Supreme Court held that Magnolia had a right to restoration. The supreme court specifically held that “Magnolia’s right to recover damages is a property right arising out of the original lease and attached to the property.” Magnolia Coal Terminal, 576 So.2d at 483.
What is also clearly expressed in the Marin footnote is that the current landowner can sue for remediation of his property. La. R.S. 30:29. See also M.J. Farms, Ltd. v. Exxon Mobil Corp., 07-2371, (La.07/01/08), 998 So.2d 16. This would include as defendants the mineral servitude owner, i.e. the lessor, as well as the lessee. Even so, the majority now on rehearing holds that the current owners of the surface, the Wagoners, have no right of action against the prior mineral lessees, Chevron, Devon and Merit.
Except as otherwise provided by law, an action can be. brought only by a person having a real and actual interest which he asserts. La. C.C.P. art. 681. The majority on rehearing reasoned that a landowner at the time of injury is the only person who has a real and actual interest in the land and that this interest is a personal right that does not run with the land absent an expressed assignment. Because the Wagoners were not the owners of the property at the time of the injury and because their deed did not have an 1 Sassignment of subsequently arising causes of action, the majority holds that plaintiffs have no right of action. I respectfully disagree.
The Mineral Code is clear that a mineral lease is a real right. La. R.S. 31:16 provides:
The basic mineral rights that may be created by a landowner are the mineral servitude, the mineral royalty, and the mineral lease. This enumeration does not exclude the creation of other mineral rights by a landowner. Mineral rights are real rights and are subject either to the prescription of nonuse for ten years or to special rules of law governing the term of their existence. (Emphasis added).
Comments following La. R.S. 31:16 state, “All things considered, the lease has the major characteristics of a real right: the mineral lease may follow the land, regardless of transfers of ownership; the mineral lessee (or holder of a mineral servitude) may assert his rights against the world just as the proprietor of any other real right; he may enjoy directly and draw from the land a part of its economic advantages by appropriating a wasting asset; he has certain rights of preference; and he holds a right that is in reality susceptible of a type of possession through exercise.”
In the case sub judice, the mineral lease from the Pasternacks to Chevron came first. Then, the Pasternacks became mineral servitude holders when they sold the property to the Funderburgs with a reservation of the minerals. The Funderburgs *29 thereafter sold the property to the Wagoners.
Because of production, the mineral servitude remains viable and the current owners of the property are subject to the real obligations and burdens of the mineral servitude and lease. “The owner of the dominant Restate may not make a use of the servitude that aggravates the condition of the servient estate. Whether a particular use results in aggravation of the condition of the servient estate is a question of fact, determined in light of the circumstances of each case. Courts take into account the situation of the estates, the needs of the dominant estate, and the prejudice, if any, sustained by the owner of the servient estate.” A.N. Yiannopoulos, 4 Louisiana Civil Law Treatise, Predial Servitudes, § 156 (3d ed.2004). See also Dupree v. Oil, Gas & Other Minerals, 31,869 (La. App.2d Cir.05/05/99), 731 So.2d 1067.
The Mineral Code places the lessee under an obligation to act as a prudent operator as to both surface and subsurface. An assignment does not relieve the lessees (Chevron, Merit and Devon) of their obligation “under the mineral lease.” La. R.S. 31:129. Likewise, the Code places the mineral servitude owner under an obligation to respect the rights of the surface owner. La. R.S. 31:22. A mineral lease and servitude are real rights and burdens on the immovable. The surface owners are subject to these real obligations. Chevron, Merit and Devon have a continuing and correlative responsibility as to the surface owners, the Wagoners.
Two recent appellate cases have rejected the subsequent purchaser doctrine. They are the First Circuit’s decision in Marin v. Exxon Mobil Corp., 08-1724 (La.App. 1st Cir.09/30/09), 2009 WL 7004332 (as previously stated, on review the supreme court declined to address this issue), and the Fourth Circuit’s decision in Eagle Pipe and Supply, Inc. v. Amerada Hess Corp., 09-0298 (La.App. 4th Cir.02/10/10), 47 So.3d 428.
In Eagle Pipe and Supply, Inc., plaintiffs purchased land that they later discovered was contaminated with radioactive waste. Initially, the majority held that because the contamination occurred under a lease prior to purchase, and the personal (as opposed to a real) right to recover damages therefrom was not expressly assigned by the former owners, plaintiffs had no right of action. On rehearing in Eagle Pipe and Supply, Inc., supra, a new majority reversed the earlier decision and held that plaintiffs were in fact the party who sustained injury and rejected the subsequent purchaser doctrine. Writing for the majority on rehearing, Judge Bonin stated:
The general rule regarding the assertion of a real and actual interest is contained in La. C.C. art. 2315(A): “Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.” The complex factual background of the current case, involving the subsequent purchase of property with a hidden defect, does not present sufficient reason to depart from the fundamental principles of injury and reparation ...
The injury is not dispelled by a subsequent purchase, and therefore we see no reason why the right to seek remedy for it should be. The injured party should not be precluded from seeking reparation merely because the damage remained hidden long enough for the property to be sold. In such cases, injury is deemed to occur when the damage is, or should have been, discovered. See, e.g., Ricks v. Kentwood Oil Co., Inc., 09-0677 (La.App. 1st Cir.02/23/10), 38 So.3d 363 (“triggering event” for coverage of emotional and mental distress damages was *30 date of discovery, as opposed to date of harmful conduct, where test of well’s water indicated presence of toxic substances from non-overt gasoline leak caused by oil company’s underground storage unit) ...
Eagle Pipe has lost the use of its land and will incur the cost of remediating the property; its property has clearly been damaged by the depositing of radioactive materials. The oil companies and transporters, if deemed responsible, are therefore obliged to make preparations to “him who suffered the injury.” Citation omitted. As a party “who suffered [an] injury,” Eagle Pipe enjoys a right of action.
Therefore, applying La. C.C. art. 2315 and the Clark line of cases, we hold that: (1) the manifestation of radioactive contamination allegedly caused by defendants constitutes an injury giving rise to a legitimate cause of action; (2) the previous owners sustained no injury through the sale of the land because they allegedly received full value for their interest as if it were uncontaminated; (3) Eagle Pipe is an injured party because the damage manifested itself after Eagle Pipe’s purchase of the land, thus devaluing Eagle Pipe’s acquisition and requiring its remediation, and (4) as an injured party, Eagle Pipe is deserving of reparation.
In the instant case, the landowners, the Wagoners, who are naked of any mineral ownership and subject to two real rights/dominant estates, can sue under the mineral code the lessees and servitude holder to clean up their property. La. R.S. 31:122, 129 and 22. Incidental and ongoing damages to the servient estate are likewise recoverable.